[No. 1615.]

## Sam. Wilkins *v*. The State.

1. Practice.—Uncontroverted affidavits, in support of a motion for a new trial, show that upon the trial of the case the indictment was not read to

the jury, that the defense did not plead in the cause, and that no plea
was entered for him. The judgment recites that the defendant pleaded
"not guilty," but it is not stated that the indictment was read to the
jury, nor that the defendant pleaded not guilty to any particular charge.
*Held*, that under such circumstances it must be considered a fact, shown
by the record, that the indictment was not read to the jury.

2. SAME.—The very first proceeding in a criminal trial, after the organization
of the jury, as provided by Article 660 of the Code of Criminal Procedure,
is that the indictment shall be read to the jury.

3. SAME.—The rule obtains that when a statute is mandatory, failure to ob-
serve it is cause for reversal of a judgment. When, however, it is merely
directory, failure to observe it will not necessarily be cause for reversal.

4. SAME.—Without laying down a rule for determining whether a statute is
mandatory or directory, it is deemed sufficient for the purposes of this
case, to reiterate a rule laid down by the Supreme Court in a similar case,
viz: "Whenever there is reason to apprehend that injury may have re-
sulted to the defendant, especially in a case of felony, from the failure to
observe directions given the court by the legislature, the judgment should
be reversed." *Held*, that the failure to read the indictment to the jury
is an omission from which it must be apprehended that injury resulted to
the defendant, and such failure is reversable error.

5. SAME—CHARGE OF THE COURT—PRESUMPTION OF INNOCENCE.—The
mere omission of the court to charge the presumption of evidence is not
error *per se*. The refusal of a charge upon that subject, however, is
reversable error.

6. SAME—NEW TRIAL.—Motion for new trial must be made at the term of
court during which the conviction was had. Amended motion filed at a
subsequent term was properly overruled.

APPEAL from the District Court of Austin. Tried below be-
fore the Hon. L. W. Moore.

The indictment charged the robbery of Rudolph Schlosser of
thirty-nine dollars and a half in money, two pistols and a dozen
boxes of sardines. The venue was laid in Austin county, Texas,
and the offense was alleged to have been committed on the
eleventh day of August, 1881. Upon his conviction, the defend-
ant was awarded a term of five years in the penitentiary.

Rudolph Schlosser testified, for the State, that on the eleventh
day of August, 1881, he was merchandising in Austin county,
Texas. The witness closed his store about sundown on that day,
and, about dusk, was sitting on the gallery with one Mazche,
when three men rode up, through Harrison's pasture, to the
fence directly opposite witness's store, and alighted. They came
up to the gallery, and witness recognized the defendant as one
of the three. He had then known the defendant some seven or

eight months, during which time the defendant lived with Foster, or at the gin on the Wilkins place, about a mile and a half from the witness's store. Defendant had frequently been at the store of witness, and had purchased articles of him. Witness did not recognize the other two men. Wilkins asked for sardines, when witness opened the store and went in. Thereupon the defendant and his two companions masked their faces, drew their pistols, presented them at the persons of witness and Mazche, and demanded of witness the surrender of his money. The three men then took about eight dollars in coin, consisting of one silver dollar, three or four half-dollar coins, and the balance of the silver in smaller coins, and, from a drawer in the back room, three ten and one five dollar bills in currency. They also took two pistols and some boxes of sardines. About this time, a noise of some kind was heard, when the defendant sprang through a window. The other two men ran out by the door, shooting off their pistols as they ran. The three men then mounted their horses. Before accomplishing the robbery, the defendant and his companions tied the witness and Mazche by the hands, back to back. It was necessary to pass through the Herring pasture in going from Foster's, on the Wilkins place, to the witness's store.

Albert Hatike deposed, for the State, that he was in Herring's pasture on the evening of the robbery of Schlosser's store. About sundown, three men on horseback passed him in the pasture, going toward Schlosser's store, from the direction of Foster's, on J. A. Wilkins's place. These men returned, going toward the Foster place, within thirty minutes. During this interim, the witness heard the report of a gun or pistol in the direction of Schlosser's store. Going back, these men passed within twenty-five yards of the witness. They rode in a lope, both going and coming. The witness did not recognize any one of them, and took little or no notice of them. One rode a gray or light colored horse, which resembled the defendant's horse. The other two men rode bay horses.

On cross-examination, the witness said that he was well acquainted with Sam. Rankin, and Sam. Wilkins, the defendant. He saw Rankin and defendant together that evening, at about four o'clock, at Foster's. Witness was then three or four hundred yards from them, and had no trouble recognizing them. He did not recognize the three persons who passed him in the pas-

ture, going towards the store, and did not think either of them was the defendant.

Re-examined by the State, the witness stated that when he said that he did not think either of the three men he saw in the pasture was the defendant, he meant that de did not think anything about them one way or the other. It was growing dark, and witness paid but little attention to the parties. The witness testified that he was examined as a witness before the examining trial, but did not remember that he testified on that trial that he thought, at the time the men passed him in the pasture, that the gray pony was that of the defendant, and that the man riding him suited the description of the defendant. At this point, the district attorney read from the written testimony of the witness before the examining trial, as follows: "Sam. Wilkin's horse is a gray pony, with a few spots on him. He was riding this horse at three o'clock, when he went to Foster's. One of the horses ridden by the three men, I thought, was Wilkin's pony. The general description and size of the man on the gray pony suited that of Sam. Wilkins."

Alex. Ray testified, for the State, that he was a renter on the Wilkins place at the time of the alleged robbery. A short time after dark, on the night of the robbery, Sam Rankin came to witness's house, drunk, and immediately went to bed. Some time after the witness's family had gone to bed, the defendant came to the witness's house, called to Sam. Rankin, and asked him to go with him, defendant, to Brenham. Rankin refused, and defendant rode off. The defendant was then riding a light colored horse, which the witness took to be his paint pony. The witness had been asleep, and did not know what time of night it was when defendant came to the house. Witness lived, at that time, about two and a half miles from Schlosser's store.

Sam. Rankin was the first witness for the defense. He testified that he lived in Brenham, Texas. About nine or ten o'clock on the morning of August 11, 1881, he left Brenham, with the defendant, to go with him to the Wilkins farm, in Austin county. On the way, defendant told witness that he wanted to go by Industry, to collect some money due him. They stopped a short time at Preen's store, in Welcome, from where they went to Industry. The defendant failed to find the party from whom he expected to collect money, and bought a bottle of whisky on credit. They then started on to the Wilkins farm, on the road to which Schlosser's store was located. They passed

Schlosser's store about four o'clock p. m., without stopping, but noticed several horses hitched at the fence. They went on to August Foster's, reaching there an hour or an hour and a half before sundown. Foster and wife, who were picking cotton near the house, came up to the house and greeted them. Witness and defendant then unsaddled their horses, put them in the lot, and fed them. Witness remained at Foster's, taking supper, until about an hour after dark, when he saddled up and rode on to old man Ray's. When he left Foster's house, the defendant was there, and had been there since an hour and a half before sundown.

Cross-examined, the witness stated that he had been drinking, but was not drunk. He sat down to table at Foster's, but did not remember whether he ate any or not—is sure, however, if he ate any at all, he ate but little. When he got to Ray's, he went to bed. After he had been asleep some time, the defendant called him to go to Brenham. Witness refused, and defendant left. Neither he nor the defendant had any money. Miss Dora Foster and her little brother came to the house from the cotton field while witness was at Foster's house.

Miss Dora Rankin testified, for the defense, that, at the time of the alleged robbery, she was living with her father, on the Wilkins place, in Austin county. She reached the house that day, from the cotton field, about sundown, and found the defendant and Sam. Rankin there. Their horses were in the lot, unsaddled. Rankin remained in the house until about an hour after dark, when he saddled up and rode off, saying that he was going to Ray's. The defendant remained at the house until about nine o'clock, which was about an hour after Rankin left. He then got his horse, and, leaving, said he was going to the "big house" on the place, and that if he could get Sam Rankin to go with him, he would return to Brenham that night. Between ten and eleven oclock, he returned, and remained all night, sleeping in the same bed with the father of the witness. The witness was positive that the defendant was at her father's house from about sundown until about nine o'clock.

On cross-examination, the witness testified that the defendant had been staying on the place most of the time during the year 1881, and was frequently at her father's house. Some two or three weeks had elapsed on the eleventh of August, 1881, since the witness last saw him. Defendant and Rankin took supper

that night at Foster's house. Supper was served about the usual hour, by lamp light.

Mrs. Foster testified, for the defense, that the defendant and Sam. Rankin came to her husband's house, on the Wilkins place, about sundown on the evening of the alleged robbery. They unsaddled their horses, put them in the lot, and fed them. Dora and her little brother came to the house, from the cotton field, about sundown. Witness stepped to the door, saw Dora shaking hands with defendant and Rankin, and, at the same time, saw three men ride out at the gate on the road leading from the Wilkins place to Schlosser's store. One of them rode a gray pony, a little darker than defendant's. This man resembled the defendant strikingly—so much so, indeed, that the witness remarked: "There goes a man just like Sam. Wilkins, and if he (Sam. Wilkins) was not here, I would take it to be him." When the defendant left the house, about nine o'clock, which was about an hour after Rankin left, he said that he was going to the "big house," and would go back to Brenham that night, if he could get Sam. Rankin to go. He returned between ten and eleven, and remained all night, sleeping with witness's husband.

Cross-examined, the witness testified that the gate through which the three men passed was in front of Foster's house, about one hundred and fifty or two hundred yards distant. When she saw them, Sam. Wilkins, Sam. Rankin, Dora and the little boy had as good or better view of the gate than the witness had. Witness stated that it was between ten and eleven when defendant returned to the house, as she heard the clock strike eleven some time after she went to bed.

August Foster testified, substantially, as did Mrs. Foster, except that he said nothing about seeing three men ride through the gate, as stated by his wife.

On cross-examination, he stated that he did not remember testifying before the examining court that the defendant did not eat any supper at his house, and that Rankin ate none, but went to Ray's for supper. He denied that he told John Lewis, two or three days after the robbery, that defendant and Rankin both left his house before supper on that evening. They both ate supper at his house.

Jas. A. Wilkins testified that he was the father of the defendant. He resided in Brenham, and owned the place in Austin county known as the Wilkins farm. On the night of the rob-

bery he was at the "big house," on that farm. After supper, about nine o'clock on that night, the defendant rode up to the house, and, seeing witness there, left. There had been some misunderstanding between the defendant and Hudson, who had charge of the place, and, at Hudson's request, witness had requested defendant to stay away from the place. Witness was acquainted with John Dashiel, a party so closely resembling defendant that witness had often mistaken him for defendant. Dashiel had frequently been on witness's premises, and witness had been requested by Hudson to keep him away. Persons going from Schlosser's store and that neighborhood to Brenham frequently traveled the road leading through witness's farm.

Thomas Whitman, for the defense, testified that in August, 1881, he was the keeper of Lockett's livery stable, in Brenham. About three o'clock on the eleventh day of that month, John Dashiel and Oscar Cannon hired two horses, which they brought back about midnight. Witness did not see Wallace with them. He knew no Wallace.

Jennie Poole testified that she lived in Brenham at the time of the alleged robbery. About eleven o'clock on that night, John Dashiel, Oscar Cannon and one Wallace came to her house, hitching their horses in the yard. Dashiel brought two pistols with him, a long and a short one. He bought beer of the witness, and paid money for it. He slept that night with Eva Pearl, for which he paid Eva money.

J. M. Bethany testified, for the defense, that the distance from Brenham to Industry was about seventeen miles; from Industry to the Wilkins place, about six miles; from the Wilkins place to Brenham, about eleven miles.

John Lewis, for the State, in rebuttal, testified that in August, 1881, he was sheriff of Austin county. A day or two after the robbery, he was at Foster's, inquiring for the defendant and Sam. Rankin. August Foster told him that the defendant and Rankin were at his house on the evening of August 11, 1881; that Rankin left about sundown, and defendant a short time afterwards; that Rankin said he was going to Ray's, and defendant said he was going to Hudson's for supper, and that neither of them took supper at his, Foster's house. Foster was a German, and did not speak English very well. He might not have thoroughly understood all that witness said to him.

The motion for new trial was lengthy and exhaustive, and comprehended all the questions discussed in the opinion.

*Breedlove & Ewing* and *Bell & Shelburne*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE.   In a motion for new trial, it is made to appear, by affidavits which were not controverted, that upon the trial of the case the indictment was not read to the jury, and that the defendant did not plead in the case, nor was any plea entered for him.   In the judgment it is recited that the defendant pleaded not guilty, but it is not stated that the indictment was read to the jury, nor that the defendant pleaded not guilty to any particular charge.

We must consider it as a fact, shown by the record, that the indictment was not read to the jury.   Such being the case, does this omission invalidate the trial and conviction?

Article 660 of the Code of Criminal Procedure provides as follows:

"A jury having been impanelled in any criminal action, the cause shall proceed to trial in the following order:

"1.   The indictment or information shall be read to the jury by the district or county attorney.

"2.   The special pleas, if any, shall be read by the defendant's counsel; and if the plea of not guilty is also relied upon, it shall also be stated.

"3.   The district attorney, or the counsel prosecuting in his absence, shall state to the jury the nature of the accusation, and the facts which are expected to be proved by the State in support thereof.

"4.   The testimony on the part of the State shall be introduced.

"5.   The nature of the defenses relied upon shall be stated by the counsel of the defendant, and what are the facts expected to be proved in their support.

"6.   The testimony on the part of the defendant shall be offered.

"7.   Rebutting testimony may be offered on the part of the the State and of the defendant."

If the provisions of this statute, requiring the indictment to be read to the jury, is *mandatory*, then the failure to observe it is such error as must set aside the conviction. If, however, it is merely *directory*, it would not necessarily be cause for reversal.

We find, upon investigation, that the rules for determining whether a statute is mandatory or directory are by no means plain and uniform. Courts have differed very much in their opinions upon the subject.

Without entering upon a discussion of the question, upon which there is so much difference of opinion, and upon which that profound jurist, Mr. Cooley, in his great work on Constitutional Limitations, declines to lay down definite rules, we think it sufficient for the purpose of this case to refer to, and adopt as a safe and sound conclusion, the remarks of Justice Moore, of our own Supreme Court, in the case of *Campbell* v. *The State,* 42 Texas, 591, in discussing a similar provision of our Code. He says: "Whenever there is reason to apprehend that injury may have resulted to the defendant, especially in a case of felony, from the failure to observe directions given the court by the legislature, we think, unquestionably, the judgment should be reversed."

We are of the opinion that a failure to read to the jury, on the trial of a felony case, the indictment, must be regarded as an omission from which we must apprehend that injury may have resulted to the defendant. "No person shall be held to answer for a felony, unless on indictment of a grand jury." (Art. 1, sec. 10, Const.) It is in and by an indictment that a defendant, the court and the jury are specifically informed of the offense for which he is being tried, and it is to the offense charged in the indictment that he enters his plea. We think the reading of the indictment to the trial jury, in a felony case, is mandatory and essential, and that, were we to hold to the contrary, it would be establishing a loose and dangerous practice, and one which would be in direct contravention to the plainly expressed will of the legislature. We are not to be understood as holding that all of the subdivisions of Article 660 are mandatory. On the contrary, we are clearly of the opinion that some of them are not, but may be treated as merely directory.

At the same term of the court at which defendant was convicted, and after his conviction, the court, of its own motion,

caused the following *nunc pro tunc* entry to be made upon the minutes, to-wit:

"The State of Texas ⎫
  "*v.* | No. 1752.   ⎬
  "Sam. Wilkins.    ⎭  "It is ordered by the court that the following order be now entered *nunc pro tunc* as of date January 12, 1883.

"The State of Texas ⎫
  "*v.* | No. 1752.   ⎬
  "Sam. Wilkins.    ⎭  "This cause being called for trial, the State came by James M. Bethany, Esq., district attorney, and the defendant came in person and by counsel, and announced ready. Whereupon came a jury of good and lawful men, who were duly tried, impaneled and sworn according to law, to-wit, John C. Sutton and eleven others. Defendant pleaded not guilty, and mistrial. Jury discharged, after having heard defendant's plea, the evidence adduced, the argument of counsel and charge of the court."

This *nunc pro tunc* entry was made upon the court's own motion, and without notice to the defendant, and after his conviction. We need not pause here to consider whether such an entry has validity, because, even if valid, it does not affect the question as to the reading of the indictment to the jury. It does not show that the indictment was read to the jury on the occasion of the mistrial, nor does it show to what charge the defendant pleaded; and, even if it were a valid entry, and showed that on that trial the indictment was read to the jury, we are of the opinion that the reading of the indictment to that jury did not dispense with the necessity of reading it to the jury which convicted the defendant.

An objection is made to the charge of the court, that it failed to instruct the jury as to the presumption of defendant's innocence. No special charge supplying this omission was requested by the defendant, and the failure of the court to instruct the jury upon this subject was not excepted to at the trial. It has been held, and we again hold, that the mere omission to charge the presumption of innocence is not error. (*Hutto* v. *The State*, 7 Texas Ct. App., 44; *Frye* v. *The State*, 7 Texas Ct. App., 94.) If the court had been requested to give such a charge, and had

refused it, then there would have been error for which the judgment would be reversed. (*Hampton* v. *The State*, 1 Texas Ct. App., 652; *Coffee* v. *The State*, 5 Texas Ct. App. 545; *McMullen* v. *The State*, 5 Texas Ct. App., 577.)

It was not error to overrule defendant's amended motion for a new trial, it having been made at a term of the court subsequent to the term at which he was convicted. A motion for new trial must be made during the term of the court at which the conviction was had. (Code Crim. Proc., Art. 779.)

There are other questions presented in the record which we do not deem it essential to discuss or determine, as they will not be likely to occur upon another trial of the case.

Because the indictment was not read to the jury upon the trial, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered February 20, 1884.